DUPONT vs. CABOT MICRO. Mr. Stoner. Thank you, Your Honor. I am pleased to court. The claim construction issue in this case is whether an ingredient in the claimed composition must come from a certain class of compounds or else be capable of functioning in a certain way in the composition. Could you help me understand this? What is the catalyst here? Is it the iron silicate compound? It is the iron on the silica that acts as the catalyst, Your Honor. That is what, indeed, DA Nanomaterials own witnesses have testified. As opposed to the iron silicate compound being the catalyst? As opposed, that is the record testimony. Now the claim does allow compounds as well as elements to be the catalyst, so it's not consequential one way or the other. Well, wouldn't it be consequential if the catalyst were the iron silicate compound? My understanding is that compound only has a single oxidation state. Iron is an intrinsic matter. No, no, I'm talking about the compound itself. I believe Dr. Thomas, their expert witness, said the catalyst is the Fe plus 3 oxidation state of iron. That's on the catalyst. But if the iron silicate compound is the catalyst, that only has a single oxidation state, right? No, the iron, even in a compound form. No, I'm talking about the iron. I'm talking about the compound. The iron in the compound only has a single oxidation state. Not as an intrinsic matter, Your Honor. What does that mean? It's a descriptive term in a textbook, as people say, is denoting a class, describing a class of compounds that have multiple oxidation states, as opposed to a class of compounds that don't. I'm understanding. Iron has multiple oxidation states, but my understanding is that the iron silicate compound only has a single oxidation state. No? No, that's incorrect. And the catalyst here, according to the record, is the iron that is adhered to the outside of the silica. And iron, as an intrinsic matter, has multiple oxidation states. When does this adherence occur? During the CMP process itself? No, it's in when the composition is made. The iron catalyst is stuck to the silica abrasive. So the oxidation state of the iron occurs prior to mixing the compound together and using it in the CMP process. A slurry. Making the slurry and then using that in the CMP process. If I understand Your Honor's question correctly, the iron always has multiple oxidation states. It is, in this case, stuck or adhered to the silica abrasive before the polishing. Chemically attached. It is chemically and physically attached, as I understand it. And once it's attached, there's only a single oxidation state. No, that's not correct, Your Honor. There's no requirement of a change in oxidation state. Iron, as we've asked, you know, even the experts, as people skilled in the art understand, if you ask them, does iron have multiple oxidation states? And the answer was yes, of course. But that's not the question I asked you. The question is when it is chemically bonded with the silica, does that compound have multiple oxidation states? Yes, it does, Your Honor. How do I know that? Because it's an iron compound. In your specification in the fifth column, you talk about the catalyst must be able to shuffle electrons, meaning that in the composition it's going to have to have multiple states in the composition because it's shuffling electrons. The first statement you made is correct. The second one is not, Your Honor. This is a preferred embodiment that the catalyst must shuffle electrons from the metal to the oxidizer, not from the metal to the catalyst, not from the catalyst to the oxidizer, but from the metal to the oxidizer. The patent never says that the catalyst... That means that in the composition it's going to have multiple states. Not necessarily, Your Honor. It's the catalyst... Well, if you're shuffling electrons, that means that the catalyst must be able to shuffle electrons from the metal to the oxidizer. So the metal will lose electrons and go to the oxidizer, but that doesn't mean the catalyst changes oxidation state. And in fact, DA Nanomaterials' own product, that's how they say it works, that they describe in the brief how electrons move from the metal to the oxidizer, their I'm not understanding the chemistry here, but I thought that's because the electron was moving from the oxidizer to the catalyst to the metal. That may be one mechanism, but the patent never says that occurs. The patent never says the catalyst changes oxidation state. It never says that. The claims certainly don't require that. And the shuffling of electrons, DA Nanomaterials' products, they say it works to shuffle electrons from the metal to the oxidizer. Why do you claim it, if what you're saying is correct, that you just need a composition that uses iron, why do you claim it as a composition with multiple oxidation states? Why don't you just say, and at least one iron catalyst? The answer is... Or catalyst of the iron group, you know, the section of the periodic table that has the same characteristics as iron. Based on the record... Why don't you just say that in your claim? Based on the record, your honor, the inventors could have done that. And as long as the iron was acting as a catalyst, which in this case there's no dispute that it is, that the multiple oxidation states, that's what the inventors were working with. You could have done that, but you didn't. We did not. Now why don't we hold you to what you did, which suggests that the composition, meaning when it's in the composition, it's going to have multiple oxidation states, shuffling electrons one state to another, which you also say in your specification. Why don't we hold you to that, if you could have claimed it in a clearer way? Well, your honor, I think there are two answers to that. The inventors claimed what they were working with, which were catalysts that have multiple oxidation states. There are some catalysts that don't. Halogens, alkaline metals don't have catalysts, but they don't have multiple oxidation states. The inventors claimed what they were working with. Based on the record, the prior art showed no chemical mechanical polishing slurry with a catalyst at all of any sort. We're not asking to be relieved from what we claimed at all. We, the claim is limited. The claim is limited to catalysts that come from the class of compounds that have multiple oxidation states. Wouldn't it have been a lot simpler just to say iron compounds? Other, there are other catalysts that have multiple oxidation states besides iron. But you could have said exactly what you just said, or at least one catalyst in the class including iron. There are, including in the class, that could have been claimed. It could have been claimed. The way it was claimed, though, was to claim the catalyst of all, all catalysts within the class that have multiple oxidation states, meaning they might exist in different oxidation states in nature. It's a simple matter of a textbook, that you go to a textbook, a person skilled in the art, and say, does this element have multiple oxidation states? And some do and some don't. It is not a functional limitation within the claim. The claim does not say changing oxidation state. The specification never says changing oxidation state. During prosecution, this was treated by the examiner. The examiner even said the multi-oxidation state metal could act as a catalyst without changing oxidation state. That was, I believe, page 688 of the appendix, that the examiner said that. And the examiner, as someone skilled in the art would treat it, treated simply the term having multiple oxidation states as a descriptive chemical term, not as a functional term. It was never suggested that iron may or may not have multiple oxidation states, depending on whether or not it changes oxidation state or anything like that. It was simply an intrinsic property of the compound. We have to assume, don't we, because you didn't appeal this aspect of the jury verdict, that the jury found that the iron compound in the slurry does not have multiple oxidation states, right? No, what the jury found was that the iron compound, you'd have to assume the iron compound did not change oxidation state within the composition, but the claim doesn't require that. And all that was required is that the catalyst in the composition... You're trying to draw a distinction between you can have multiple oxidation states even though there's no change of Absolutely. That's the critical distinction. That's the critical issue in this appeal. And it's the first is a descriptive chemical term, well-known to people skilled in the art. Some elements have multiple oxidation states, some don't. The second is a functional term that talks about what this ingredient does or is capable of doing within the composition. And the claim doesn't require that, and this court's precedent says if there isn't a function recited in the claim, you don't import it into the claim. And that's respectfully what the district court did here. If you remove that functional limitation and give the claim the plain meaning, as we say and we consistently argue throughout the case, then infringement is undisputed, at least as to the 288 patent. But Your Honor has hit on exactly the issue that having multiple oxidation states is descriptive of an intrinsic property. It's a chemical term that this iron can exist, might exist, in nature in different oxidation states. Silver has a different oxidation rate also, right? I believe that's true. I mean it's one of the elements on the element chart. Okay, and in the prosecution history, didn't you state that the prior differed from the invention because it contained silver? The distinction in the prosecution history between the prior art, including that that used silver, and the invention was that the multi-oxidation state metals, which were indisputably present in the prior art, did not act as a catalyst. Catalyst is a functional term. It is defined by what it does, but there was never a distinction made between the saying that there was a catalyst in the prior art, but it did not have multiple oxidation states. It was, the distinction was there was no catalyst at all in the compound. So that is the critical distinction. There was never any disclaimer, and based on the record, there actually is no prior art showing a whether it had multiple oxidation states or not. And in this case, not to repeat myself, but the inventors did, they could have claimed more than they did, but we understand we were stuck with what they claimed, but what they claimed was a certain class of catalysts and not others. And it's indisputed in this case that DNA Nanomaterials uses one of the catalysts that they claimed, which is iron, which of course has multiple oxidation states. How is the iron the catalyst when the catalyst in the DuPont's accused product, an iron silicon? It is, it is, there is no question that the iron is, is, is the catalyst. And we look at the, we look at the record, Dr. Thomas, he was asked what is the catalyst? Who's Dr. Thomas? He was the DNA Nanomaterials expert witness at the trial, and there was, he was asked what is the catalyst in the, in the, in the composition, and he said it is the iron on the silica. And that is intrinsically, has multiple oxidation states. Where does he say that? I'm sorry? Where does he say that? Where does he say that? That is at A, sorry your honor, Question, this is A, 151, 151, 57. 151, 17. 151, 8, no, 15157. 15157. Where does he say that? It's at the top of the page. Question, again, what is the catalyst in the DA nano system? Answer, the actual catalyst is the iron 3 plus. That's iron in the plus 3 oxidation state. It is the active sitter that is anchored to the silica. Well, that second sentence seems to suggest it's the compound. There is another statement at A15346. Again, Dr. Thomas, and there was a reference to the statement that DA nano materials had made in one of its patents. And the question was, does that describe the particles in the DA nano 3600 and 3700 slurries? Answer, it certainly describes essentially part of the action of the iron catalyst on the silica. Yes. So, your honor, that's, I'm running out of time. Thank you, Mr. Stoner. Give Mr. Dunner an extra two minutes if he needs to use it. I will restore Mr. Stoner's full rebuttal time. Good morning, your honors, and may it please the court. DA nano does not dispute, I call it DA nano or DuPont either way, does not dispute that there's testimony that the iron is the catalyst. But what Mr. Stoner has ignored is the language right under what he read, 15157. It is in my opinion, it in my opinion cannot, or during this process does the iron 3 plus change oxidation states? It cannot because the hydroxyls find it much easier to oxidize the tungsten than to do something similar with the iron. You have to look at oxidation potentials and the 288 patent knows all about oxidation potentials. There's a ton of testimony that when the iron is bound to the silica, and it is bound to the silica, it cannot change oxidation states. That testimony is not only in the page I just read, but on 16416 and 16392. Moreover, there is testimony, uncontradicted testimony, that the shuffling electron statements in the column 5 of the 288 patent, that cannot take place unless the iron or the catalyst can change oxidation states in the context of the CMP. There were questions asked on both of those and it is undisputed. Now as to Mr. Stoner's position that this statement in column 5 of the 288 patent is just an embodiment, that isn't what the language says. It may be in a section which talks of description of the current embodiment, but it starts out the chemical mechanical composition of this invention and then it uses the words must. It must be able to shuffle electrons and there's plenty of case law on the subject that when you have statements like this, even when it's in a section called the preferred embodiment, nevertheless that's the invention. ChemE versus PPG 2005, Honeywell v. ITT 2006. Is this an instance though Mr. Dunner of you, of your claim construction requiring a functional aspect in a claim, in a composition claim? Are you importing a function into a composition claim? Your Honor, I don't know about importing. I don't think I'm importing anything. I think the claim language dictates that. It is a function. Well it could be read as he suggests, as a property. You know, you get from the class of catalysts that have multiple oxidation states, you pick one. Your Honor, the answer is given by counsel for Cabot himself on A14601 at the pretrial conference on June the 7th, 2010. The court asked, there was a debate as to what the claim meant. So the court says, so the multiple oxidation states only relate to the context of the CMP, Mr. Turan, who is Cabot counsel. That's correct, Your Honor, and that is quite clear from the claims themselves. Every one of the claims that we will be presenting in this trial begins with the language a chemical mechanical planarization composition. The court, that answers it. So at this hearing, they conceded the very point that is being debated today. Now as to it being a functional composition, my recollection of the Cabot briefs is they cite cases for the proposition that there are times when you can include a functional aspect in a claim that otherwise does not recite the function, and they themselves admit that the word catalyst is a functional claim. Well, the key phrase that we are debating is catalyst having multiple oxidation states. So I would suggest that their argument about what this claim covers and doesn't cover is also a red herring in this case. Moreover, if I understand correctly, this the iron silicate compound is created before it's introduced into the slurry, and that that compound, whether it's in the slurry or not in the slurry, the iron only has a single oxidation state. Is that correct? Outside of the, outside of this invention, outside, outside of the slurry, iron has multiple oxidation states. That's not my question. Maybe I misunderstood you. My question is when the iron is combined with the silicon, it only can have a single oxidation state, whether or not it is in the slurry. Exactly, Your Honor. Exactly. It doesn't depend on the fact that it's in the slurry. It's just an inherent property of the combination of the iron and the silicate, right? That's exactly right, Your Honor, and their position is basically that you have to look at the iron disassociated from the silica, and in the abstract, they refer to testimony, does iron have multiple oxidation states? The question was detached from silica. There was no silica in the question, and the answer was, of course, or yes, as it does. Outside, not only outside of CMP, but outside of the combination with silica, it has multiple oxidation states, but what this case is all about in the context of CMP, and that is the court's claim construction, and they acknowledge that in that context, if the district court's construction was correct, then we prevail on the ultimate question of infringement. Blue 36, note 16 is where they say that. I submit that not only do the claims themselves, as admitted by Mr. Turan, dictate this result, but I submit that the spec, referring to the shuffling language that Chief Judge Rader referred to, also dictates that result, and I suggest that the prosecution history dictates that result. They had multiple references which were rejected, the claims were rejected on these references under 102 grounds, and those references disclosed every element of the claims in the 288 patent. What was their answer? Their answer was a functional answer. It was not that this doesn't have multiple oxidation states. They couldn't say that, and they couldn't say it because the references had the iron, or the silver, or whatever the catalytic metal, or potentially catalytic metal could be, in solution. So in that context, it could have multiple oxidation states. How did they distinguish it? They wasn't the right concentration of the metal to act as a catalyst. That's a functional argument. That basically undermines their argument that you can't make functional arguments. That's the prosecution history. Finally, they also distinguished these similar references in the trial on the ground, same ground, that functionally it couldn't, it couldn't operate as a catalyst. What is their response to that? The response is, well that's a validity issue. Well, it may be a validity issue, and we dropped our cross-appeal on validity, but nevertheless it also goes to the claim construction in this case. Now in the few seconds I have left, actually I see I have more than a few seconds, but as I've been told before, I don't have to use all my time, so I may not. There's a waiver issue in this case. How could you argue waiver when at the charge conference at 14603 they specifically reserve the possibility of appealing from the original claim construction? Let me do my best to answer that question. The point I'm making, there are two points here. One, I think we should win regardless of waiver, but I also think there's a good waiver argument here, and here it is. We acknowledge that earlier on, before that pretrial conference, they in fact made the argument they're making today. They argued that, and we don't dispute that, but at the pretrial conference, June 7, 2010, the judge, there was a dispute as to what the charge conference, you're right, there was a dispute as to what the and it goes from 14599 to 14603. In that colloquy, Ms. Kramer specifically says I'm not waiving our appellate rights to challenge the original claim construction. Why should it be a waiver? Why are you relying on your honor? It's on page 14603 at line 12. Your honor, that's Ms. Kramer. I had the caveat that I added on the other claim construction issue, which is by entering into this compromise, etc., etc., we're not waiving our appellate rights to argue an alternative definition of multiple oxidation states. Your honor, that's our counsel. Yeah. That's not their counsel. We said we are not waiving. That's not their counsel. Their counsel was asked by the judge. Okay. Do you, I made the same mistake when I was preparing for argument, and I found out that Ms. Kramer was our counsel, not Cabot's counsel. The judge asked them, are you taking the position that the multiple oxidation states has to take place outside the context of the CMP? The answer was no, your honor, and then the judge repeated it multiple times, and two counsel, not only one of the counsel, but their chief counsel said, your honor, we're not taking that position, and then they said, I'd like to think about it, and the judge says, don't think about it. Well, don't, this is on 14603, don't come back to the court and make the decision now. I'll do my best, is the answer, not to come back. Your honor, I think we can live with this construction. Mr. Stoner, it's fine, your honor. The court, it's fine. Thank you. The next day, so as of this moment, they not only argued that the claim required the construction that D.A. Nano is arguing, but they were not going to change their minds. The very next day, they filed a paper in which they reiterated their earlier contention that they're reserving their right. I have no idea what happened to that paper. I have no idea whether the judge considered it or didn't consider it. I just don't know anything, but I submit they never recanted their statement that the claims dictate the result that D.A. Nano is arguing, and I suggest that that's a waiver. We get it in there, in the paper that they did file, they do state that they're reserving the issue for appeal. They did, your honor. And what's your position then between having this, this oral waiver that's followed up with the written submission where an issue is preserved for appeal? Do you, do you have any case law that would help us with that? Your honor, this is such an unusual situation there. The case law basically says that you can't change positions from below to up on appeal. But this is a very... That's not what's happening here. No, this is a very unusual fact pattern. I cannot give you a case with a fact pattern like this, and I cannot give you, for us, and I cannot give you a case with a fact pattern like this against us. All I'm saying is, the judge says, don't come back. This is it. I want your decision now, right before the judge. I submit, and moreover, they said the claim dictates that result. I submit that the next day, a written paper does not undermine that, particularly because they didn't recant their statement that the claim dictates the result. Yeah, but we've repeatedly held that raising a claim construction issue at the initial Markman hearing is sufficient. You don't have to reiterate your objection at the, at the charge conference. Your honor, in the abstract, that is true, but it's true only in the abstract. And the reason I say that is that much happened between that early... The Markman, the Markman ruling did not rule on multiple oxidation states. It ruled on catalyst. After the Markman hearing, there was exchange summary judgment papers, and the definitions evolved, but at the charge conference, the judge realized that they were taking a position that was incompatible with his view of what the, what the claim should mean. And that's where they made their statement. They took their stand in response to the judge's question, don't come back. They construed the claim as being, as requiring our construction, and I say that the next day, they can't take it all back in a, in a paper that is filed. But in either case, I submit that DA Nono's position is the correct position. I'm a little troubled with that position. We, we all know the difficulty of oral conferences in front of a judge with the pressure on, and we can find it difficult to want to disappoint the judge who's going to preside over the rest of the case. In those pressure situations, we might say one thing and then a reflection, wish to preserve an argument. Doesn't that seem like the more responsible legal position to take? Your Honor, if they had taken the position the next day that we recant our statement that the claims require it, I think that might be a more compelling position. The answer is, I've given you our position on this issue, and I'm in the hands of the three judges on this bench. I have no further arguments unless there are questions. Thank you, Mr. Dunner. Mr. Dunner, we restored your two minutes. I appreciate it, Your Honor. Very briefly. Can you address this passage on 14-601 that Mr. Dunner just referred to, so the multiple oxidation states only relate to the context of the CMP? That's correct, Your Honor. Your Honor, this is not a waiver or a concession of anything. We had made the same argument to the district judge below. The district court rejected it, and now we are at the pretrial conference trying to craft a jury instruction reflecting the court's prior Markman rulings. We were not revisiting claim construction issues. We were trying to come up with a jury instruction that reflected what the court had already ruled, and we told the court that's what we were doing. All the court said, the multiple oxidation states only relate to the context of the CMP. That is not a shorthand reference to what we're arguing today. Every single claim we're asserting begins with chemical mechanical polishing slurry, and so every element of that claim relates to that context. This was a question about infringement proof. DA Nanomaterials had suggested to the district court that we were going to ignore the court's claim construction ruling and present evidence that was not compatible with it, and we were assuring the district court we were not going to do that. That's all this was about. Briefly, I wanted to point to address Judge Dyke's question about whether a compound with iron in it can have multiple oxidation states, even if it does not change oxidation state. I think the specification addresses that. In column five, it says preferably the catalyst is chosen from metal compounds that have multiple oxidation states, such as, but not limited to, and then there's a whole list of elements, not compounds, elements. One of those is iron. It never says that these have multiple oxidation states if they change, or they might have multiple oxidation states depending on whether they change. It says they have multiple oxidation states if there's iron in them. Thank you, Your Honor. Thank you, Mr. Stoner.